DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

FELTON CARLSON,                    )
                                   )
              Plaintiff,           )    Crim. No. 2013-115
                                   )
         v.                        )
                                   )
NORWEGIAN CRUISE LINE HOLDINGS,    )
LTD.,                              )
                                   )
              Defendant.           )
                                   )

**Appearances:**

**Ryan C. Meade**
Quintairo, Prieto, Wood & Boyer, P.A.
Miami, FL
    *For Felton Carlson,*

**Jennifer Quildon Miller-Brooks**
Hanilton, Miller & Birthisel, LLP
Miami, FL
    *For Norwegian Cruise Line Holdings, Ltd.*

## MEMORANDUM OPINION

**GÓMEZ, J.**

Before the Court is the motion of Norwegian Cruise Line

Holdings, Ltd., to vacate an arbitration award.

### I.    FACTUAL AND PROCEDURAL HISTORY

Felton Carlson ("Carlson") is a citizen of the Republic of

Nicaragua. Norwegian Cruise Line Holdings, Ltd. ("Norwegian"),

is a corporation incorporated under the laws of Bermuda.

Norwegian's principal executive offices are located in Florida.

The Norweigan Sky is a cruise ship registered in the Bahamas.

Norwegian owned and operated the Norwegian Sky.

Carlson was previously employed by Norwegian Cruise Lines

(Bahamas) Ltd. ("NCL") as an assistant waiter aboard the

Norwegian Sky. On November 28, 2011, Carlson signed an

employment contract with NCL. The employment contract included

an arbitration clause, which read:

> Seaman agrees . . . that any and all claims,
> grievances, and disputes of any kind whatsoever
> relating to or in any way connected with the Seaman's
> shipboard employment with [NCL] . . . [,] whether
> asserted against [NCL], Master, Employer, Ship
> Owner, Vessel or Vessel Operator, shall be referred
> to and resolved exclusively by binding arbitration
> pursuant to the United Nations Convention on
> Recognition and Enforcement of Foreign Arbitral
> Awards (New York 1958) ("The Convention") . . . .
> The arbitration shall be administered by the
> American Arbitration Association ("AAA") under its
> International Dispute Resolution Procedures. . . .
> A single Arbitrator is to be jointly appointed by
> the [Norwegian Seafarer's Union ("NSU")] and/or the
> Seaman, on one side, and [NCL], on the other side .
> . . . The language of the arbitration shall be
> English. The place of the arbitration shall be the
> Seaman's country of citizenship, unless arbitration
> is unavailable under The Convention in that country,
> in which case, and only in that case, said
> arbitration shall take place in Nassau, Bahamas. The
> substantive law to be applied to the arbitration
> shall be the law of the flag state of the vessel.
> Each party will, upon the written request of the
> other party, promptly provide the other with copies
> of documents relevant to the issues raised by any
> claim or counterclaim on which the producing party

may rely in support of or in opposition to any claim
or defense. Any dispute regarding discovery, or the
relevance or scope thereof, shall be determined by
the arbitrator according to the IBA Rules on the
Taking of Evidence in International Commercial
Arbitration, which determination shall be
conclusive. All discovery shall be completed within
sixty (60) days following the appointment of the
arbitrator. At the request of a party, the arbitrator
shall have the discretion to order examination by
deposition of witnesses to the extent the arbitrator
deems such additional discovery relevant and
appropriate. . . . All objections are reserved for
the arbitration hearing except for objections based
on privilege and proprietary or confidential
information. [NCL] and the Seaman acknowledge that
they voluntarily and knowingly waive any right they
have to a jury trial. The arbitration referred to in
this Article is exclusive and mandatory. In
addition, the NSU, Seafarer, and [NCL] shall have
exclusive authority to resolve any claims,
grievances, and, disputes relating to the validity
and enforceability of the arbitration provision of
this Agreement, as well as any and all disputes
relating to the location of the arbitration,
applicable choice of law, and the procedures and
rules employed during the arbitration. Lawsuits or
other proceedings between the Seaman and the Company
many not be brought except to enforce a decision of
the Arbitrator. . . .

ECF No. 28, Exh. 1 at 6-7.

On August 17, 2012, while working aboard the Norwegian Sky,
Carlson was told by a supervisor to retrieve pressed tablecloths
from the Norwegian Sky's laundry. When Carlson arrived at the
laundry, no pressed tablecloths were available. Agus Triwindu
("Triwindu"), who worked at the laundry, told Carlson to press

the tablecloths himself. Triwindu demonstrated how to use the
pressing machine. Thereafter, Carlson and Triwindu pressed
several tablecloths together. Triwindu then left the laundry
room, and Carlson continued pressing tablecloths. Shortly
afterwards, Carlson's hand was caught in the press.

After his arm was freed from the laundry press, Carlson was
diagnosed by Dr. Ruben Parejo ("Dr. Parjeo"), the senior doctor
aboard the Norwegian Sky. Dr. Parejo determined that Carlson had
sustained a soft tissue compressed injury to his forearm.

On August 20, 2012, Carlson was seen by Dr. James Voglino
("Dr. Voglino"), an orthopedic surgeon. Dr. Voglino diagnosed
Carlson with an acute crush type injury and a fractured wrist.
An MRI performed on August 24, 2012, confirmed this diagnosis.

On September 5, 2012, Dr. Joel M. Levin ("Dr. Levin")
diagnosed Carlson with compressive neuropathy and acute carpal
tunnel syndrome. On September 10, 2012, Dr. Jesse Basandre ("Dr.
Basandre") performed carpal tunnel release surgery on Carlson.

On December 3, 2013, Carlson commenced a civil action
against Norwegian by filing a complaint in this court. On
February 14, 2014, Carlson filed an amended complaint. Carlson's
amended complaint asserted claims for (1) Jones Act negligence;
(2) unseaworthiness; (3) failure to provide maintenance and

cure; and (4) failure to provide prompt, proper, and adequate medical treatment.

On January 29, 2015, Carlson moved to stay proceedings in this Court pending arbitration. On March 6, 2015, the Court referred this matter to arbitration and ordered the matter stayed pending the completion of arbitration.

Subsequently, Carlson filed a claim for arbitration in the International Center for Dispute Resolution ("ICDR") for the American Arbitration Association ("AAA"). Arbitration proceeded under the ICDR's Expedited Procedures. Victoria Platzer ("Platzer") was appointed as arbitrator.

On April 24, 2016, Norwegian served its written submissions and evidence on Carlson. With respect to Carlson's failure to provide prompt, adequate, and complete treatment claims, Norwegian argued that the opinions of Carlson's expert were "cursory and lack any evidentiary support. In contrast, the medical records and the declarations of the treating doctors and [Norwegian]'s experts clearly establish Carlson received prompt, proper and adequate medical care." *Id.* at 41. In support of this argument, Norwegian attached declarations from Carlson's treating physicians and surgeons, Dr. Ruben Parejo, Dr. James Voglino, and Dr. Jesse Basandre, as well as a medical expert, Dr. Lewis Eastlick.

On May 5, 2016, Platzer entered an order providing that "[e]ach party [wa]s permitted to file a brief, no more than 5 pages in length, in response to the written submissions by the opposing party." *Id.* at 1. Carlson submitted a brief arguing that Norwegian "intentionally withheld materials (declarations that had never before been produced), which for the first time were provided in its written submissions" and that Platzer should "strike the declarations and provide no consideration." ECF No. 63 at 7 (emphasis omitted).

On June 9, 2016, Platzer received all of the parties' written submissions. At that time, the hearing was formally closed.

On July 1, 2016, Platzer entered an arbitration award in Miami, Florida (the "original arbitration award"), which Platzer labeled as the "FINAL AWARD." See ECF No. 85, Exh. 8 at 1. Platzer denied relief to Carlson on his unseaworthiness, maintenance and cure, and contract claims. Platzer granted Carlson relief on his Jones Act negligence and failure to provide prompt, proper, and adequate medical treatment claims.

In a footnote, Platzer noted that Carlson "objected to the tribunal considering several declarations included in Respondent's submissions which Claimant asserts were not timely filed." *Id.* at 4 n.2. Platzer also noted that "Respondent did

not respond to Claimant's assertions." *Id.* "As such, the
tribunal [did] not consider[] those declarations in reaching a
decision on this case." *Id.*

With respect to Carlson's Jones Act negligence claim,
Platzer found that, "*but for* [Norwegian]'s employee, Triwindu,
allowing an untrained unauthorized person, i.e. Claimant, to use
the Mangler Machine, Carlson would not have been injured." *Id.*
at 3. Platzer also found that Carlson's "own negligence
contributed to the accident." After reducing the award 50% for
comparative negligence, Platzer awarded Carlson $75,000 for his
Jones Act negligence claims.

With respect to Carlson's failure to provide prompt,
proper, and adequate medical treatment claims, Platzer explained
that Carlson's expert, Dr. Freshwater, "opined that the surgery
[on Carlson's wrist] should have been performed on the day of
the incident." *Id.* at 4. As a result of the delay, Carlson
suffered "permanent damage to his median nerve, permanent muscle
tightness and permanent joint stiffness." *Id.* Platzer awarded
Carlson $100,000 for Norwegian's failure to provide prompt,
proper, and adequate medical treatment claims.

On August 12, 2016, Carlson filed a motion to enforce the
original arbitration award in this Court. On August 19, 2016,
Norwegian moved to vacate the original arbitration award.

On March 27, 2017, the Court held a hearing on Norwegian's motion. After taking evidence and hearing argument from both parties, the Court held that Platzer "had committed 'misconduct in refusing to hear evidence pertinent and material to the Norwegian,' 9 U.S.C. § 10(a)(3), and 'otherwise' prevented Norwegian from 'presenting it] case,' *Convention Done at New York June 10, 1958*, T.I.A.S. No. 6997 (Dec. 29, 1970) (Article V(1)(b))." *See* ECF No. 76 at 2 (alterations omitted). The Court vacated the original arbitration award and remanded this matter to arbitration.

On May 23, 2017, the ICDR advised the parties that it had appointed Platzer as their arbitrator. Norwegian objected to Platzer's appointment. The ICDR subsequently confirmed and "formalized" Platzer's appointment. *See* ECF No. 81, Exh. 5 at 1.

On July 27, 2017, Platzer held a preliminary conference with the parties "to see exactly what [their] interpretation of the Court's order [wa]s and then to see how [they] would like to proceed." *See* ECF No. 81, Exh. 8 at 3. At the hearing, Platzer expressed some confusion about the scope of the Court's remand, and asked the parties for their interpretations. After hearing argument, Platzer determined that she would "read the affidavits [previously not considered], reconsider the evidence, as [she] already had it, and then issue a new award." *Id.* at 22.

On August 28, 2017, Platzer issued her second arbitration award in Miami, Florida, captioned "AMENDED FINAL AWARD" (the "second arbitration award") *See* ECF No. 81, Exh. 1 at 1. Explaining the procedural footing of the award, Platzer explained that [t]he parties agreed that . . . [Platzer], in rendering this Amended Final Award, should only consider the additional evidence which had been excluded, and not any supplemental submissions." *Id.* at 2.

The second arbitration award was substantially the same as the original arbitration award and awarded Carlson the same relief as the original arbitration award. Platzer denied relief to Carlson on his unseaworthiness, maintenance and cure, and contract claims. Platzer granted Carlson relief on his Jones Act negligence and failure to provide prompt, proper, and adequate medical treatment claims.

With respect to Carlson's Jones Act negligence claim, Platzer found that, "*but for* [Norwegian]'s employee, Triwindu, allowing an untrained unauthorized person, i.e. Claimant, to use the Mangler Machine, Carlson would not have been injured." *Id.* at 4. Platzer also found that Carlson's "own negligence contributed to the accident." *Id.* After reducing the award 50% for comparative negligence, Platzer awarded Carlson $75,000 for his Jones Act negligence claims.

With respect to Carlson's failure to provide prompt, proper, and adequate medical treatment claims, Platzer explained that that Carlson's expert, Dr. Freshwater, "opined that the surgery [on Carlson's wrist] should have been performed on the day of the incident." *Id.* at 6. As a result of the delay, Carlson suffered "permanent damage to his median nerve, permanent muscle tightness and permanent joint stiffness." *Id.* Norwegian's expert, Dr. Eastlick, "disagreed with Dr. Freshwater's opinion," and opined that Carlson's muscle tightness or joint stiffness "were not caused by any delay in surgery." *Id.* Platzer found "Dr. Freshwater's opinion more persuasive when considered with all other evidence in the case." *Id.* Platzer awarded Carlson $100,000 for Norwegian's failure to provide prompt, proper, and adequate medical treatment claims.

On November 8, 2017, Norwegian moved to vacate the second arbitration award.

## II. DISCUSSION

As an initial matter, the Court must determine whether this action is governed by the Federal Arbitration Act ("FAA") or the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").

The domestic FAA applies to arbitration agreements in commercial contracts that are "entirely between United States citizens." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 523 (3d Cir. 2009) (citing 9 U.S.C. § 202). Here, one of the parties to the contract was not a United States Citizen.

The New York Convention provides that it

> shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

*Convention Done at New York June 10, 1958*, T.I.A.S. No. 6997 (Dec. 29, 1970) (Article I(1)) (hereinafter, "*N.Y. Convention*"). An arbitration award falls under the New York Convention if it "involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. The New York Convention also applies to awards that are not entirely between citizens of the United States. *Id.*

Here, the arbitration award was issued in favor of Carlson, a citizen of Nicaragua. As such, the New York Convention applies.

When the New York Convention applies, it "provides the exclusive grounds for refusing confirmation" of an arbitration award. *See Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d Cir. 1997). Under the New York Convention, one of the grounds for refusing confirmation is when an award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." *N.Y. Convention*, Section V(1)(e). This provision "allow[s] a court in the country under whose law the arbitration was conducted to apply domestic arbitral law . . . to a motion to set aside or vacate that arbitral award." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 21. Thus, when an arbitration award is rendered in the United States and a party moves to vacate that award in the United States, district courts may apply the FAA to that motion. *See Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account,* 618 F.3d 277, 292 (3d Cir.2010), *as amended* (Dec. 7, 2010) ("[T]he [New York] Convention specifically contemplates that the [country] in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its

domestic arbitral law and its full panoply of express and
implied grounds for relief.").

Here, the arbitration award was made in the United States,
specifically Miami, Florida. Norwegian has moved to vacate the
award in the United States, specifically the U.S. Virgin
Islands. Under these circumstances, the Court may apply the
FAA's vacatur standards. *See id.* at 292 (applying "the domestic
FAA and its vacatur standard" to award governed by the New York
Convention "because the arbitration took place in Philadelphia,
and the enforcement action was also brought in Philadelphia").

Under the FAA, courts review arbitration awards using an
"extremely deferential standard." *Hamilton Park Health Care Ctr.
Ltd. v. 1199 SEIU United Healthcare Workers E.*, 817 F.3d 857,
861 (3d Cir. 2016) (quoting *Dluhos v. Strasberg*, 321 F.3d 365,
370 (3d Cir. 2003)). Under this standard, there is a strong
presumption . . . in favor of enforcing arbitration awards."
*Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d
237, 241 (3d Cir. 2005). Nevertheless, a court's review of an
arbitration award is not without teeth, and "effusively
deferential language notwithstanding, the courts are neither
entitled nor encouraged simply to 'rubber stamp' the
interpretations and decisions of arbitrators." *Hamilton Park*

*Health Care Ctr. Ltd.*, 817 F.3d at 861 (quoting *Matteson v.*

*Ryder Sys. Inc.,* 99 F.3d 108, 113 (3d Cir.1996)).

The FAA "specifies four circumstances under which a

district court can vacate an arbitral award. . . . [T]hese are

the 'exclusive grounds' for moving to vacate an award in a

district court" under the FAA. *Whitehead v. Pullman Grp., LLC*,

811 F.3d 116, 119 (3d Cir. 2016) (quoting *Hall St. Assocs.,*

*L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 584 (2008)). The four

circumstances in which vacatur is permitted are codified at 9

U.S.C. § 10, which provides:

> In any of the following cases the United States court
> in and for the district wherein the award was made
> may make an order vacating the award upon the
> application of any party to the arbitration--
>   **(1)** where the award was procured by corruption,
>   fraud, or undue means;
>   **(2)** where there was evident partiality or
>   corruption in the arbitrators, or either of them;
>   **(3)** where the arbitrators were guilty of misconduct
>   in refusing to postpone the hearing, upon
>   sufficient cause shown, or in refusing to hear
>   evidence pertinent and material to the
>   controversy; or of any other misbehavior by which
>   the rights of any party have been prejudiced; or
>   **(4)** where the arbitrators exceeded their powers,
>   or so imperfectly executed them that a mutual,
>   final, and definite award upon the subject matter
>   submitted was not made.

9 U.S.C. § 10(a).

Norwegian argues that, after rendering the original award, Platzer became *functus officio* and had no authority over this matter. Thus, Norwegian argues, Platzer exceeded her powers in rendering the second award.

An arbitrator's "authority derives from contract." *See Roquette Freres S.A. v. Solazyme, Inc.*, 673 Fed. App'x 219, 221 (3d Cir. 2016). As such, when determining whether an arbitrator exceeded her authority, courts must first look to the contract and then to "the parties' conduct as a whole." *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 114 (3d Cir. 1996). Under Section 10(a)(4), "'an arbitrator may not venture beyond the bounds of his or her authority' and an award is 'enforceable only to the extent it does not exceed the scope of the parties' submission.'" *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd.*, 400 Fe. App'x 654, 655-56 (3d Cir. 2010) (quoting *Matteson*, 99 F.3d at 112-13). Given the FAA's deferential standard, the question under Section 10(a)(4) "is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013).

"As a general rule, once an arbitration panel renders a decision regarding the issues submitted, it becomes *functus*

*officio* and lacks any power to reexamine that decision."
*Colonial Penn Ins. v. Omaha Indem. Co.*, 943 F.2d 327, 331 (3d
Cir. 1991). At common law, this rule "was applied strictly," and
"provided simply that when 'arbitrators have executed their
award and declared their decision they are *functus officio* and
have no power or authority to proceed further.'" *Teamsters Local
312 v. Matlack, Inc.*, 118 F.3d 985, 991-92 (3d Cir. 1997)
(quoting *Mercury Oil Refining Co. v. Oil Workers Int'l Union,*
187 F.2d 980, 983 (10th Cir.1951)). The doctrine prevented
arbitrators from revisiting final awards on their own, and when
a final arbitration award was vacated, the original arbitrator
could not revisit the matter on remand. *See, e.g., Muskegon
Cent. Dispatch 911 v. Tiburon, Inc.*, 462 Fed. App'x 517, 527-28
(6th Cir. 2012) ("[T]he *functus officio* doctrine provides the
circumstances in which remand to the original arbitrator, rather
than a new arbitrator, is appropriate.").

Though originating at common law, "the *functus officio*
doctrine has been routinely applied in federal cases brought
pursuant to the [FAA]," *Colonial Penn. Ins.*, 943 F.2d at 331,
and the New York Convention, *see M & C Corp. v. Erwin Behr GmbH
& Co., KG*, 326 F.3d 772, 782 (6th Cir. 2003) (discussing
doctrine in case controlled by New York Convention). When
applied in cases controlled by the FAA or the New York

Convention, courts are "less strict" in their application of the

doctrine of *functus officio*. *See Teamsters Local 312*, 118 F.3d

at 991.

In this context, the doctrine continues to prevent

arbitrators from "reconsider[ing] or amend[ing] the merits of an

initial award," whether on remand or otherwise. *Id.* Under three

circumstances, however, arbitrators are permitted to revisit

final awards to address limited issues. As the Third Circuit has

explained,

> (1) an arbitrator can correct a mistake which is
> apparent on the face of his award; (2) where the
> award does not adjudicate an issue which has been
> submitted, then as to such issue the arbitrator has
> not exhausted his function and it remains open to
> him for subsequent determination; and (3) where the
> award, although seemingly complete, leaves doubt
> whether the submission has been fully executed, an
> ambiguity arises which the arbitrator is entitled to
> clarify.

*Id.* at 991-92 (quoting *Colonial Penn. Ins.*, 943 F.2d at 329-30);

*see also Green v. Ameritech Corp.*, 200 F.3d 967, 977 (6th Cir.

2000) ("A remand is proper, both at common law and under the

federal law of labor arbitration contracts, to clarify an

ambiguous award or to require the arbitrator to address an issue

submitted to him but not resolved by the award." (internal

quotation marks omitted)). Further, "[*f*]*unctus officio* is merely

a default rule, operative if the parties fail to provide

otherwise." *Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, CLC, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 848 (7th Cir. 1995).

The cases addressing the doctrine of *functus officio* generally deal with arbitrators revisiting awards on their own or a district court's remand of arbitration after review of an arbitration award. Here, on July 1, 2016, Platzer entered a final arbitration award in this matter. On March 27, 2017, the Court vacated that arbitration award and remanded the case to the ICDR, not Platzer.  On remand, the ICDR reappointed Platzer as the parties' arbitrator. The Court is aware of no precedent addressing this scenario.

The underlying policy behind the current application of the *functus officio* doctrine "is an 'unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a final decision which he has already rendered, because of the potential evil of outside communication and unilateral influence which might affect a new conclusion.'" *Colonial Penn Ins.*, 943 F.2d at 331–32 (quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.,* 378 F.2d 569, 572 (3d Cir. 1967)).  In other words, the modern application of the doctrine of *functus officio* is motivated by a concern that, because of the informal nature of arbitration, arbitrators are

at a greater risk of being swayed by a party's reaction to the arbitrator's decision. *See id.* The doctrine acts to remove the danger of such improper influence and ensures decisions are not motivated by any reason other than the merits of the case. *See id.* This concern should apply with equal force when the arbitrator is reappointed after a case is remanded to an organization of arbitrators like the ICDR. The Court sees no reason that the doctrine would not apply in these circumstances.

Here, the parties' contract did not outline a course of action to take in the event that an arbitration award were vacated. In addition, the parties did not agree to resubmit this matter to Plazter when they proceeded to their second iteration of arbitration. Thus, the doctrine of functus officio provides the "default rule." *See Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union, AFL-CIO, CLC, Local 182B*, 56 F.3d at 848. Accordingly, Platzer was without power to reexamine her original decision unless one of the three exceptions applies.

Consistent with the underlying policy behind the *functus officio* doctrine, the three circumstances in which arbitrators are permitted to revisit awards "were narrowly drawn to prevent arbitrators from engaging in practices that might encourage them to change their reasoning about a decision, to redirect a distribution of an award, or to change a party's expectations

about its rights and liabilities contained in an award."
*Teamsters Local 312*, 118 F.3d at 992. As such, "whether a case
falls within one of these categories must be considered in light
of the underlying rationale for the modern application of
*functus officio.*" *Id.*

One exception to the *functus officio* doctrine permits an
arbitrator to "correct a mistake which is apparent on the face
of his award." *Colonial Penn. Ins.*, 943 F.2d at 332. This
exception "is designed for cases of clerical mistakes or obvious
errors of arithmetic computation." *Teamsters Local 312*, 118 F.3d
at 992; *see also Martel v. Ensco Offshore Co.*, 449 F. App'x 351,
356 (5th Cir. 2011) ("[B]y amending the original judgment, the
arbitrator corrected a clerical error, and his actions thus fell
within the bounds of an exception to the *functus officio*
doctrine."). Where the correction of a mistake requires the
consideration of "extraneous facts," the exception does not
apply. *Teamsters Local 312*, 118 F.3d at 992; *see also Kennecott
Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1272 (10th Cir.
1999) (explaining permissible amendments to final awards must
not "augment[] or alter[] the award in any way other than
clarifying").

Another exception permits an arbitrator to adjudicate an
issue that was submitted but not addressed in the final award.

See *Colonial Penn. Ins.*, 943 F.2d at 332. The rationale for this

exception is that "the arbitration agreement between the parties

is still in force and the arbitrator's power over the remainder

of the unresolved submission continues." *Teamsters Local 312*,

118 F.3d at 992. For example, when an arbitrator who was asked

to determine liability and fashion a remedy enters an award

addressing only liability, the matter may be remanded to the

arbitrator to determine the appropriate remedy. *See, e.g.*, *Int'l

Bhd. of Elec. Workers, Local No. 265 v. O.K. Elec. Co.*, 793 F.2d

214, 216 (8th Cir. 1986); *see also Int'l Ass'n of Machinists,

AFL-CIO v. Crown Cork & Seal Co.*, 300 F.2d 127, 127 (3d Cir.

1962) (affirming remand of award to arbitrator where arbitrator

determined defendant was liable but "failed to make an express

disposition of the question of damages which also had been

submitted to him"). With respect to the unresolved issue, there

is no reasoning to change, distribution to redirect, or

expectations to change, thus "the arbitrator is not exposed to

any greater risk of impropriety than would normally exist during

the pendency of the arbitration proceedings." *La Vale Plaza,

Inc. v. R.S. Noonan, Inc.,* 378 F.2d 569, 573 (3d Cir. 1967).

Finally, an exception permits an arbitrator to clarify an

ambiguity in a final award. *Colonial Penn. Ins.*, 943 F.2d at

332. This exception encompasses awards that "fail[] to address a

contingency that later arises" and awards that are "susceptible

to more than one interpretation." *Green v. Ameritech Corp.*, 200

F.3d 967, 977 (6th Cir. 2000). "The purpose of this exception is

to permit the arbitrator to complete an assigned task, and by

resolving the ambiguity, the arbitrator is simply completing his

duties by clarifying his reasoning, not reopening the merits of

the case." *Id.* (internal quotation marks and alterations

omitted); *see also La Vale Plaza, Inc.*, 378 F.2d at 573

(explaining that it is permissible for arbitrator to revisit

award under third exception because "there is no opportunity for

redetermination on the merits of what has already been

decided").

Here, there were no clerical errors or arithmetical

mistakes in Platzer's original award. Thus, the exception that

permits arbitrators to correct those mistakes does not apply.

Platzer's original award also contained no ambiguities in need

of clarification. Thus, the exception permitting arbitrators to

clarify ambiguous awards does not apply.

Carlson argues that the exception permitting arbitrators to

adjudicate unaddressed issues applies and that "it was

appropriate to remand the matter back to . . . Platzer . . . to

give her the opportunity to review the seven . . . declarations

for the first time and complete her duty to make a subsequent determination." *See* ECF No. 84 at 9.

Significantly, an arbitrator's duty is to resolve disputes between the parties, i.e., whether one party is liable to the other, and if so, what remedy is appropriate. *See, e.g., Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 37 (D.C. Cir. 2016) (explaining that an "arbitrator is called upon to resolve any impasse between[the parties]"). The exception to the *functus officio* doctrine addresses disputes that were submitted for arbitration, not procedural disputes that arise during the arbitration itself. *See, e.g., Int'l Bhd. of Elec. Workers, Local No. 265*, 793 F.2d at 216; *Int'l Ass'n of Machinists, AFL-CIO*, 300 F.2d at 127. As such, the "issue" of the content of the declarations is not the type of unaddressed issue that permits an arbitrator to revisit a final arbitration award.

Because the the Court's remand of Platzer's original arbitration award was not under one of the three circumstances that would have permitted Platzer to revisit and revise her original award, Platzer was without power to enter the second arbitration award. *See, e.g., Teamsters Local 312*, 118 F.3d at 991. As such, the Court holds that Platzer "exceeded [her] powers." 9 U.S.C. § 10(a)(4). Accordingly, the Court will vacate the arbitration award.

The premises considered, it is hereby

**ORDERED** that the motion for extensions of time to file responses docketed at ECF Numbers 83, 86, and 87 are **GRANTED**; it is further

**ORDERED** that the motion for leave to file excess pages docketed at ECF Number 93 is **GRANTED** *nunc pro tunc* to December 23, 2017; it is further

**ORDERED** that the motion to strike docketed at ECF Number 89 is **MOOT**; it is further

**ORDERED** that the motion for oral argument docketed at ECF Number 97 is **DENIED**; it is further

**ORDERED** that Norwegian's motion to vacate docketed at ECF Number 81 is **GRANTED**; it is further

**ORDERED** that the August 28, 2017, arbitration award is **VACATED**.

**S\**_____
       **Curtis V. Gómez**
       **District Judge**